## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
## ABINGDON DIVISION

| | | |
|---|---|---|
| **JUDY A. ATKINS,** | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 1:18CV00048 |
| | ) | |
| v. | ) | **OPINION AND ORDER** |
| | ) | |
| **SMYTH COUNTY VIRGINIA SCHOOL** | ) | JUDGE JAMES P. JONES |
| **BOARD, ET AL.,** | ) | |
| | ) | |
| Defendants. | ) | |

*Mary Lynn Tate, Tate Law PC, Abingdon, Virginia, for Plaintiff; Jennifer D. Royer, Royer Law Firm, P.C., Roanoke, Virginia, for Defendants.*

Plaintiff Judy A. Atkins brings this action under Title VII of the Civil Rights Act of 1964, alleging that her former employer, defendant Smyth County Virginia School Board ("School Board"), discriminated against her by permitting a hostile work environment. Relying on state law, she also asserts that her former coworker, defendant Kevin Leonard, assaulted her. Following discovery, the defendants have moved for summary judgment. For the reasons that follow, I will grant the motion.

### I.

The following material facts, taken from the summary judgment record, are stated in the light most favorable to Atkins.

Atkins worked as the cafeteria manager at Atkins Elementary School in Smyth County, Virginia, from 2008 until she resigned in January 2018. Defendant Kevin

Leonard was a custodian at the school.  He also happens to be married to Atkins'
estranged sister.

Atkins did not report to Leonard, and Leonard did not report to Atkins.  Each
of them reported directly to the principal, who at the time of the events at issue was
Gary Roberts.  Leonard was required to be in the kitchen and cafeteria two to three
times per day to perform some of his duties, like taking out the trash and putting up
stock.  He also sometimes had to be in the kitchen to repair equipment.  Atkins
admits that as cafeteria manager, she had the ability to ask him to leave if he was in
the kitchen doing something other than his job duties.  None of Atkins' job
responsibilities required her to have any contact with Leonard except when he was
in the cafeteria.  Atkins admits that if Leonard was in the cafeteria doing something
she did not like, she had the ability to leave the cafeteria.

Atkins testified in her deposition that Leonard would smirk and stare at her.
He mumbled or said things that she could not understand.  She characterized this
behavior as bullying.

Atkins testified that on October 31, 2017, when the cafeteria was using
disposable plates and generating more trash than usual, Leonard told her to "[g]et
[her] f'ing ass over [to the dishwasher] and do your job."  Defs.' Mem. Supp. Mot.
Summ. J. Ex. 4, Atkins Dep. 21, 23, ECF No. 43-4.  She admitted that he did not
have the authority to direct her to wash dishes.  She reported the incident to Director

of Support Services Phillip Griffin,[1] and she testified that he laughed in response. Atkins testified that on the same day, Leonard jerked a serving cart out of her hand, causing her to experience pain in her hand.  She testified that she saw a nurse practitioner for treatment, but she did not produce any related medical record and never filed a workers' compensation claim.

Atkins testified that on November 30, 2017, she was sweeping the floor in the area of three large, wheeled trash cans while Leonard was taking the trash out.  Using her foot, she pushed one of the trash cans in Leonard's direction.  Leonard grabbed the trash can and pushed it back in her direction.  It bumped her stomach.  Although she did not mention it in her deposition testimony, she wrote in a Report of Discrimination that Leonard had lifted his hand in a fist.  Atkins reported this incident to Griffin that afternoon, and he investigated the next day.   Griffin concluded that while the interaction did occur, no discipline was warranted.

In the Report of Discrimination that she submitted when she resigned, Atkins also complained of a separate trash can incident that she said occurred on September 13, 2017.  She wrote that Leonard had rolled a trash can into her so hard that it nearly knocked her over.  There were no witnesses to this event, and Atkins' account could not be corroborated.

---

[1]  Griffin oversaw food services for the School Board and, as such, had some supervisory responsibility over Atkins.

Part of Leonard's job included leaf blowing on the grounds of the school. Atkins routinely parked under a large tree and next to a road. Leonard used a leaf blower near this parking area. Atkins told Griffin that Leonard blew leaves onto her car, although she never testified that she actually witnessed him doing so. She had previously told former principal Warren — at least five years earlier — that Leonard put sticks under her windshield wipers. It is unclear whether she had personal knowledge of this alleged behavior.

Atkins accused Leonard of unplugging her work computer overnight and tipping over a container of strawberries in the refrigerator in November 2017. She never saw him do either of those things, and she is not aware that anyone else saw him do those things. She acknowledged that others had access to the kitchen, including nighttime custodians.

At some point, Atkins complained to Griffin that Leonard was placing cartons of milk into a different refrigerator in order to save them for himself. She also complained to Griffin that Leonard was being reimbursed for mileage when he drove his personal vehicle to retrieve a school bus for bus duty.

Atkins testified that sometimes Leonard would say things to her like "You need to be doing something and quit relying on people to do things for you." *Id.* at 55. When he was pushing trash cans through the kitchen, he would bump into the serving line that had her computer on it. Sometimes he would push a trash can up

to where Atkins and other cafeteria workers were standing and would wait for them to move out of his way, without saying anything.  She testified that she "would squeeze up underneath the table so that he could get by [her], but he always made an attempt to hit the chair and flip [her] around." *Id.* at 56.  She testified that he was supposed to take the trash cans out through the dining room rather than through the kitchen.  Atkins stated that she did not complain to Leonard about these things because "I was afraid of him.  I felt like he would bully me or do something else to get back at me." *Id.* at 58.

Atkins testified that Leonard did certain things that violated health and safety rules, like serving himself from behind the serving line in the kitchen.  When the health inspector told Atkins that Leonard was not allowed to do these things, Atkins told her, "I am afraid to tell him," to which the inspector responded, "That's your job to tell him." *Id.* at 59.  Atkins instead reported Leonard's violations to principal Roberts.  Leonard began going through the serving line as he was supposed to do, but Atkins testified that "he would look at me and he would hold his tray and just stare at me while they put servings on his tray, like he was getting mad because he couldn't do it himself, that they had to serve him." *Id.* at 60.

Atkins testified that Leonard would push aside her things next to her desk to make room for his own belongings.  She stated that he treated the kitchen like his own personal space.  Atkins testified that on one occasion, she passed Leonard in

the hall while he was carrying a leaf blower and he stared at her and pointed the leaf blower at her.  She testified that on another occasion, Leonard made a derogatory remark about the church she attended.

Atkins testified that Leonard never behaved improperly toward men and that "[h]e just aggravated the women." *Id.* at 84.  When asked why she thought she was a target of Leonard's bad behavior, Atkins stated, "Because I am a woman and I had more power than he did. . . . He didn't like women telling him what to do." *Id.* at 92. She also stated, however, that Leonard placed trash cans containing trash in front of Roberts' door, and Roberts is a man.

Atkins testified that she resigned because she could not take Leonard's harassment and bullying and that she suffered deep depression and anxiety as a result.  Cole Spencer, Director of Human Resources for Smyth County School Board, investigated the complaints Atkins had made in her Report of Discrimination. He found that most of the incidents could not be corroborated, but that even if everything had happened as Atkins described, Leonard's actions would not amount to discrimination on the basis of sex or create a hostile work environment.  He concluded that while Atkins and Leonard did not get along and may have engaged in some unprofessional interactions, nothing indicated that the conflict or Leonard's actions were motivated by Atkins' gender.  Spencer did not take any disciplinary action against Leonard.

In opposition to the Motion for Summary Judgment, Atkins submitted declarations of two of her former subordinates who worked in the cafeteria, Patty Joyce Romans and Sherry Mitchell.[2]  Romans stated that she was intimidated by Leonard and that he "once loudly threatened to damage my car if I parked close to his again."  Br. Opp'n Ex. A ¶ 4, ECF No. 45-1.  She wrote that Leonard would "eat meals at a table beside Judy's desk.  It was obvious she did not like that."  *Id.* ¶ 5. Leonard would also leave his things next to Atkins' desk.  He would hit her with trash cans as he pushed them past her desk.  Romans witnessed Atkins reporting these things to Roberts and Griffin, but they "laughed at her and said, 'Oh, that's just a family thing,'" which Atkins denied.  *Id.* ¶ 6.  Romans declared that Leonard "would stare at Judy in a very mean, hateful and angry look following us with his stare."  *Id.* ¶ 9.  "If [they] spoke to him and tried to be nice, he would ignore it as if he didn't hear."  *Id.*  According to Romans, Leonard did not behave the same way toward the men in the building.

Mitchell's declaration is similar (and in large part, identical) to Romans'. She declared that Leonard would "get close to you from behind where you could not see him and stand there without saying 'excuse me' or anything."  Br. Opp'n Ex. B ¶ 4, ECF No. 45-1.  When a person would jerk or jump upon realizing his presence, he

---

[2] Atkins' brief in opposition also extensively cites to Roberts' deposition, but the transcript of that deposition is not in the record before the court.

would "mumble and move around." *Id.* She stated that on one occasion, she put a full trash can by the back door for him to empty, and he became angry and left it there for three days.

The cafeteria staff consisted of three people, all of whom were women. At the time of the events at issue, there were seven male employees and 27 female employees working at Atkins Elementary School. Leonard was one of only five men who worked at the school during the day, when Atkins was on duty. The other four men were the principal, an instructional aide, and two teachers. Since Atkins' departure, three female cafeteria managers have been employed at Atkins Elementary School, and none of them have complained about Leonard. The administration has not received any complaints about Leonard since Atkins' departure.

Mitchell, a woman, became the cafeteria manager after Atkins' departure. Mitchell did not complain about Leonard's behavior toward her after Atkins resigned, either in her declaration or in any grievance or complaint to her supervisor.

II.

Summary judgment is warranted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  A fact is material if its existence or non-existence could result in a different jury verdict. *JKC Holding Co. v. Wash. Sports Ventures, Inc.*, 264 F.3d 459, 465 (4th Cir. 2001).  When ruling on a summary judgment motion, the court should consider the parties' pleadings, depositions, answers to interrogatories, admissions on file, and affidavits. *Celotex Corp. v. Catrett ex rel. Catrett*, 477 U.S. 317, 322 (1986).  "[T]he nonmoving party must rely on more than conclusory allegations, mere speculation, the building of one inference upon another, or the mere existence of a scintilla of evidence." *Johnson v. United Parcel Serv., Inc.*, 839 F. App'x 781, 783 (4th Cir. 2021) (unpublished) (quoting *Humphreys & Partners Architects, L.P. v. Lessard Design, Inc.*, 790 F.3d 532, 540 (4th Cir. 2015)).

"[C]ourts may not resolve genuine disputes of fact in favor of the party seeking summary judgment." *Tolan v. Cotton*, 572 U.S. 650, 656 (2014). "Summary judgment cannot be granted merely because the court believes that the movant will prevail if the action is tried on the merits." *Jacobs v. N.C. Admin. Off. of the Cts.*, 780 F.3d 562, 568 (4th Cir. 2015) (quoting 10A Charles Alan Wright &

Arthur R. Miller, *Federal Practice and Procedure* § 2728 (3d ed. 1998)).  The court may not assess credibility on a motion for summary judgment.  *Id.* at 569.

Summary judgment is not a disfavored procedural shortcut, but an important mechanism for weeding out claims and defenses that have no factual basis.  *Celotex Corp.*, 477 U.S. at 327.  It is the affirmative obligation of the trial judge to prevent factually unsupported claims and defenses from proceeding to trial.  *Drewitt v. Pratt*, 999 F.2d 774, 778–79 (4th Cir. 1993).

"Only evidence that would be admissible at trial may be considered for summary judgment purposes."  *Hunter v. Prince George's Cnty.*, 36 F. App'x 103, 106 (4th Cir. 2002) (unpublished).  "[H]earsay evidence, which is inadmissible at trial, cannot be considered on a motion for summary judgment."  *Md. Highways Contractors Ass'n v. Maryland*, 933 F.2d 1246, 1251 (4th Cir. 1991).  The burden is on the proponent of summary judgment material to show its admissibility.  Fed. R. Civ. P. 56(c)(1)(B) advisory committee's note to 2010 amendment.

In their briefs, both parties have cited to a number of hearsay statements. While the plaintiff has generally objected to the consideration of hearsay, she has not pointed to particular statements that she contends are inadmissible. Nevertheless, in deciding the Motion for Summary Judgment, I have considered only evidence that would be admissible at trial.

A.

I will first address Atkins' claims arising under Title VII.  Atkins has separated her claims of sexual harassment creating a hostile work environment (Count Two) and sex-based discrimination creating a hostile work environment (Count Five). However, I will take up these claims together, as "[a] hostile work environment due to sexual harassment is discrimination based on sex."  *EEOC v. Burlington Med. Supplies, Inc.*, 536 F. Supp. 2d 647, 653–54 (E.D. Va. 2008) (citing *Meritor Sav. Bank v. Vinson*, 477 U.S. 57, 64–66 (1986)).

Title VII of the Civil Rights Act of 1964 makes it unlawful for an employer "to discriminate against any individual with respect to [her] compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin."  42 U.S.C. § 2000e-2(a)(1).  "Since an employee's work environment is a term or condition of employment, Title VII creates a hostile working environment cause of action."  *EEOC v. R & R Ventures*, 244 F.3d 334, 338 (4th Cir. 2001).  To state a hostile work environment claim, Atkins must show that the alleged conduct "(1) was unwelcome, (2) was based on her sex, (3) was sufficiently severe or pervasive to alter the conditions of her employment and create an abusive work environment, and (4) was imputable to her employer."  *Ocheltree v. Scollon Prods., Inc.*, 335 F.3d 325, 331 (4th Cir. 2003).

As to the first element, employees can demonstrate that conduct is unwelcome by voicing their objection to it to the alleged harasser or to the employer. *Strothers v. City of Laurel, Md.*, 895 F.3d 317, 328–29 (4th Cir. 2018). Here, the defendants do not dispute that Leonard's alleged conduct was unwelcome to Atkins.

As to the second element, "[a]n employee is harassed or otherwise discriminated against because of his or her sex if, but-for the employee's sex, he or she would not have been the victim of the discrimination." *Wrightson v. Pizza Hut of Am., Inc.*, 99 F.3d 138, 142 (4th Cir. 1996) (internal quotation marks omitted). "The critical issue . . . is whether members of one sex are exposed to disadvantageous terms or conditions of employment to which members of the other sex are not exposed." *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 80 (1998) (citation omitted).  Plaintiffs may prove sex-based discrimination even though they are not subjected to sexual advances or propositions. *Hoyle v. Freightliner, LLC*, 650 F.3d 321, 331 (4th Cir. 2011).  For instance, they may show that conduct constituted discrimination based on sex by showing that they were harassed "in such sex-specific and derogatory terms . . . to make it clear that the harasser is motivated by general hostility to the presence of women in the workplace" or by offering direct comparative evidence about how the alleged harasser treated members of both sexes. *Oncale*, 523 U.S. at 80–81.  A plaintiff's claim may proceed even though the

discrimination was not solely because of sex, as long as sex was one cause. *Wrightson*, 99 F.3d at 144.

The third element of a hostile work environment claim — that the conduct was so severe or pervasive as to create an abusive work environment — has both subjective and objective components. *EEOC v. Cent. Wholesalers, Inc.*, 573 F.3d 167, 175 (4th Cir. 2009). Plaintiffs must show that they did perceive, and a reasonable person would perceive, the environment to be abusive or hostile. *Id.* In conducting the subjective inquiry, courts need only look at the testimony of the complaining witnesses. *R & R Ventures*, 244 F.3d at 339. "In conducting the objective inquiry, courts should examine all the circumstances, including (1) the frequency of the discriminatory conduct; (2) its severity; (3) whether it is physically threatening or humiliating, or merely offensive; and (4) whether it unreasonably interferes with an employee's work performance." *Id.* (internal quotation marks and citation omitted). Simple teasing, offhand comments, and isolated incidents, unless extremely serious, do not amount to a sufficiently abusive or environment. *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998).

As to the fourth element — whether the alleged harasser's conduct was imputable to the employer — the employer's liability depends on the status of the harasser. *Vance v. Ball State Univ.*, 570 U.S. 421, 424 (2013). If the harasser is the victim's coworker, the employer is liable only if it was negligent in controlling

working conditions.  *Id.*  In other words, the employer is liable only "if it knew or should have known about the harassment and failed to take effective action to stop it by responding with remedial action reasonably calculated to end the harassment." *Pryor v. United Air Lines, Inc.*, 791 F.3d 488, 498 (4th Cir. 2015) (internal quotation marks, citation, and alterations omitted).  In evaluating the employer's response, courts may consider the promptness of any investigation, the specific remedial measures taken, and the effectiveness of those measures.  *Id.*

Atkins' claim fails as a matter of law because she has not met her burden of proof as to the second element — that Leonard's behavior toward her was based on her sex.  There is virtually no evidence from which a reasonable jury could conclude that Leonard's behavior was motivated by Atkins' sex.  The only support for this element is Atkins' speculation that Leonard did not like a woman having more power than him, and vague, conclusory testimony by Atkins, Romans, and Mitchell that Leonard did not behave the same way toward his few male coworkers.  It is worth noting that none of those male colleagues worked in the cafeteria, so it is unclear whether Atkins, Romans, or Mitchell would even have had any meaningful opportunity to observe Leonard's interactions with them.   There is simply nothing in the record that would allow a jury to conclude, based on anything more than speculation, that Leonard mistreated Atkins because of her sex.

Because Atkins cannot prove this essential element of her Title VII claim, it is unnecessary to consider the parties' arguments regarding the School Board's handling of her complaints. While there are a number of disputed facts in this case, none of them are material. Viewing the evidence in the light most favorable to Atkins, the nonmovant, the School Board is entitled to judgment as a matter of law on Counts II and V, and I will grant the Motion for Summary Judgment.

## B.

I next turn to Atkins' state-law claim of assault. Because I have granted summary judgment in favor of the defendants as to Counts II and V, which provide the basis for federal question jurisdiction, I will decline to exercise supplemental jurisdiction over Atkins' state-law claim. 28 U.S.C. § 1367(c)(3). I will dismiss Count III without prejudice.[3]

---

[3]   "[U]nder 28 U.S.C. § 1367(d), state law claims brought in federal court under supplemental jurisdiction that are dismissed 'shall be tolled' while the claim is pending in federal court, and for a period of 30 days after dismissal." *Trantham v. Prince George's Cnty.*, No. TJS-20-2158, 2022 WL 484931, at *12 (D. Md. Feb. 16, 2022)

III.

For the foregoing reasons, the Motion for Summary Judgment, ECF No. 42, is GRANTED as to Counts II and V.   Count III is DISMISSED WITHOUT PREJUDICE.  A separate final judgment will be entered herewith.

It is so **ORDERED**.

ENTER:   February 25, 2022

/s/  JAMES P. JONES
Senior United States District Judge